FILED

2019 Aug-26  AM 09:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHAWNA STEWART                                        Plaintiff

V.                                    CASE NO. 2:18-cv-1930-CLM

JONES UTILITY AND CONTRACTING                        Defendants
CO., INC., ET AL

**TRANSCRIPT OF MOTION HEARING**

BEFORE HONORABLE COREY L. MAZE
UNITED STATES DISTRICT JUDGE

August 14, 2019
Anniston, Alabama

APPEARANCES:

REPRESENTING THE PLAINTIFF:   Scott Thomas Morro, Esq.
                              Morro Law Center
                              P.O. Box 1644
                              Gardendale, AL  35071

REPRESENTING THE DEFENDANTS:  Arnold William Umbach, III, Esq.
                              Starnes David Florie, LLP
                              100 Brookwood Place, 7th Floor
                              Birmingham, AL  35209

ALSO PRESENT:  Belinda Mobley, Esq.

COURT REPORTER:  Margaret Wasmund, RDR, CRR, CRC
                 1729 5th Avenue North, Suite 104
                 Birmingham, AL  35203
                 601-329-6113
                 margaretwasmund@gmail.com

```
1                (August 14, 2019, 3:07 p.m.)
2                THE COURT:  I want to thank everybody for coming
3        today.  Welcome to Anniston.  We are glad that you could join
4        us.  The first thing I want to do is have everyone introduce
5        themselves.  And, as a reminder, please speak slowly.  We have
6        a court reporter here today, and she needs to ensure that she
7        gets everyone's name and everything you say on the record.
8            So let's start with the plaintiff.  Who is here for
9        Ms. Stewart?
10               MR. MORRO:  My name is Scott Morro, M-O-R-R-O.
11               THE COURT:  Good to see you, Mr. Morro.  Is that
12       Ms. Stewart with you, or is that a cocounsel?
13               MR. MORRO:  This is cocounsel, Belinda Mobley.
14               THE COURT:  Welcome, Ms. Mobley.
15               MS. MOBLEY:  Thank you.
16               THE COURT:  All right.  And who do we have for the
17       defense?
18               MR. UMBACH:  Your Honor, Trip Umbach, T-R-I-P,
19       Umbach, U-M-B-A-C-H, for the defendants, Ricky Jones, Jones
20       Utility, and Pat Jones.
21               THE COURT:  Okay.  So you are here for all of the
22       defendants?
23               MR. UMBACH:  Yes, Your Honor.
24               THE COURT:  Very good.  So what I wanted to do today,
25       we are here on two motions to dismiss.  One of them is a joint
```

1    motion by the company Jones Utility and Ricky Jones.  I think

2    it says "Richard Jones," but everything has called him Ricky so

3    far.  So I will -- if I refer to him as Ricky, I think we all

4    know who I'm talking about.  And then a separate motion to

5    dismiss by Patricia Jones, who I think everyone has called Pat

6    in the briefing.  So if I say "Pat," I am referring to

7    Defendant Patricia Jones.

8         So those are the only motions I believe I have pending in

9    front of me, which we are here on oral argument today on those

10   motions.  Before I call either of you up, there are three

11   questions that I have for both of you jointly, and I want to

12   see if we can agree on those.

13        The first one is:  Do we have a specific date that we

14   agree on that Ms. Stewart stopped working for Jones Utility?  I

15   have the letter of November 10th, 2016, in which she was told

16   that she would no longer be accommodated working after hours,

17   but I'm not sure that I saw in the pleadings anywhere a

18   specific date that she stopped working.  So did she stop at

19   that point and never come back?  Was she officially terminated

20   by letter at some other point?  Is there something that has

21   been pleaded that gives me that date?

22        MR. MORRO:  Judge, I think you're correct about her

23   stopping and never coming back.  I don't believe there was an

24   actual official termination or resignation.  As you have

25   gleaned from the pleadings, her father was her employer.

1          THE COURT:  Correct.

2          MR. MORRO:  And she had been given a reasonable

3    accommodation.  At a certain point, that ended.  And so I

4    think, to answer your question, I don't think there is a

5    specific day that is worked out where she actually either quit

6    or was terminated.

7          THE COURT:  Would you agree, then, that she was

8    effectively terminated on that date?  She was told that she

9    would no longer be allowed to work with her after-hours

10   accommodation.  So, in her mind, she was effectively terminated

11   because she could not work in the manner in which she believed

12   she needed to with her disability?

13         MR. MORRO:  Yeah, and I think that -- that's correct,

14   Judge.  And I'm looking at our -- the first amended complaint,

15   paragraph 24.  "On November 10 of 2016, Jones sent a letter to

16   Stewart withdrawing the reasonable accommodation of her working

17   after hours."

18         THE COURT:  Okay.

19         MR. MORRO:  And so if -- if Trip may have more on

20   that than me --

21         THE COURT:  Yes.  Mr. Umbach, do you have any

22   objection to us considering November 10th, 2016, as the

23   effective termination date?

24         MR. UMBACH:  No, Your Honor.

25         THE COURT:  Okay.  Then that's what -- for purposes

1    of these motions, I am going to agree that November 10th, 2016,

2    was an effective termination date because, as I have in the

3    record, it's, I think, Exhibit 20-5 -- I'll look that up in a

4    little while -- that was the date that she got the letter

5    saying that your accommodation is no longer going to be given

6    to you.  And she did not come back to work.

7         All right.  The second question is:  Does the plaintiff --

8    does Ms. Stewart have any claims in the defendant's lawsuit?  I

9    know there's a state lawsuit in Jefferson County that was filed

10   by the company and the father.  Has Ms. Stewart filed any

11   counterclaims, or does she have any claims at all in that case?

12   Or is this lawsuit the only claim she has against Jones Utility

13   or her father?

14            MR. UMBACH:  I suspect we'll agree on this, Your

15   Honor.  She does not have any claims in that case, and she does

16   not -- other than this case, doesn't have any claims of her own

17   against my clients.

18            THE COURT:  Okay.  Is that right, Mr. Morro?

19            MR. MORRO:  Yes, sir.  I believe that's correct.

20            THE COURT:  Okay.  Then the last one is, and this one

21   is probably a little more contentious, but I feel like, from

22   reading the briefs, that I think Mr. Morro will have to agree.

23   Putting the state law claims aside, Counts 6 through 11, I'm

24   only looking at 1 through 5 right now.  Do we all agree that

25   there can be no federal claims against the individuals -- that

1   is, the father Ricky Jones and the stepmother Pat Jones -- that

2   the only claims are truly against Jones Utility?

3           MR. MORRO:  I agree with that, Judge.

4           THE COURT:  So what I want to do now is focus on

5   Counts 1 through 5, and that would be Ms. Stewart v. Jones

6   Utility only, not anything that was done by the father or the

7   stepmother, but the claims as they relate to Stewart v. Jones

8   Utility.  And I want to bring up Mr. Morro first.

9       And while you're coming up, I'll tell you where I want to

10  start.  It seems that there's a disagreement between the two of

11  you with regard to timing on which EEOC complaint gave you the

12  right to sue in this proceeding.  And before you tell me, I'm

13  going to tell you that I actually agree with you that the way I

14  read all five of your federal counts, they all stem from the

15  2018 EEOC complaint, that is, the 2018 EEOC complaint was

16  essentially directed at Jones Utility and the parents for the

17  hostile work environment and the retaliation that came after

18  she filed an EEOC complaint regarding Keith Day; is that

19  correct?

20          MR. MORRO:  Yes.

21          THE COURT:  So -- because I don't read any of these

22  counts to say that they are based on what happened with Keith

23  Day.  I believe that all of them are related to the parents and

24  the company's reaction to what happened with Keith Day.  Is

25  that a fair statement?

1          MR. MORRO:  Well, I think to the extent of hostile

2    work environment and continuing action there that Keith Day

3    certainly had something to do with her environment.  But the

4    actions of Mr. Jones and Ms. Jones in badgering and trying to

5    get her to drop the initial charge are certainly at the focal

6    point of our second charge.

7          THE COURT:  Okay.

8          MR. UMBACH:  Your Honor, I detect a little confusion,

9    and I don't know if you would like me to try to clear it up at

10   this point before you build on that or just --

11         THE COURT:  I think that -- I think you'll see where

12   I'm going as I question Mr. Morro about it.

13         MR. UMBACH:  Okay.

14         THE COURT:  But just giving you sort of a headlight

15   into where I'm going, I'm trying to determine the appropriate

16   dates.  And if Mr. Morro is correct that the counts primarily

17   come at the parents' and the company's reaction to the first

18   EEOC complaint, then, to me, the triggering date for the

19   180 days are the actions taken by the company and the parent

20   with respect to the EEOC complaint, and then the 90 days would

21   come after the right-to-sue letter, which would have been on

22   August 20th of 2018.

23      So I think you'll see where I'm going as I question

24   Mr. Morro.  I've actually got the complaint in front of me.

25   And for the next few minutes, I just want to walk you through

1     the five counts so that I believe that we're all on the same

2     page as to what the triggering events are.

3          And I'm looking specifically at paragraphs 82, 83, and 84

4     of Count 1.  So if you've got that, it's page 15 of the

5     complaint -- the amended complaint.

6          And it says, essentially, that on June 1st of 2016,

7     Stewart filed her first EEOC charge, and that was the one

8     regarding Keith Day, that she was continually harassed and

9     badgered and was subject to a hostile work environment by the

10    parents, Ricky and Pat Jones, after filing that charge.  That

11    means after June 1st of 2016.  And Stewart was threatened with

12    termination if she didn't drop the EEOC charge.  Just for

13    record purposes, did I generally read that correctly?  That's

14    the allegation?

15              MR. MORRO:  Yes.  But, for the record, Judge, I just

16    want to point out that Pat Jones is not her parent.  It is her

17    stepparent.

18              THE COURT:  Stepmother.  That is correct.  Her mom

19    passed away of cancer, and then the stepmother became

20    stepmother approximately six months later.  It was within the

21    year.

22              MR. MORRO:  That's right, Judge.  Okay.  Yes, sir.

23              THE COURT:  I actually did a good bit of reading

24    before today.  I have read both lawsuits from both sisters, so

25    I have a pretty good understanding of the background of the

1  family disputes.

2      In your brief on page 17, in response to the defendant's

3  argument, you say that the hostile work environment started on

4  June 3rd of 2016 and ran all the way through November 10th of

5  2016, which is what we said was her effective termination date.

6  That was the day she got the letter that said, "We're no longer

7  going to give you an accommodation of after-hours."

8      What was it specifically from June 3rd?  That was two days

9  after she filed the charge.  Was there some triggering event or

10  something that was said to her by her father, by her

11  stepmother, or by the company that triggered the hostile work

12  environment?

13          MR. MORRO:  What page were you on on my brief?

14          THE COURT:  It's page 17 of your brief.  It's

15  Section B, the third sentence.  I'll just read it out loud for

16  the record.  It says, "From about June 3rd, 2016, until

17  November 10th, 2016, after learning of the charge filed by

18  Stewart, R. Jones and Patricia Jones, a corporate officer of

19  Jones Utility, became hostile towards Stewart."  So in your

20  brief, you give the hostile work environment a timeline of June

21  3rd to November 10th.

22      It's not in the complaint, or at least I'm not sure it is,

23  but I'm going to give you a chance.  What, if anything, do you

24  know happened on June 3rd that started the hostile work

25  environment?

1          MR. MORRO:  And I'm going from memory.  I believe

2     that Mr. Jones found out that Shawna had utilized some of her

3     tape recordings against her father and was assisting her sister

4     in furthering her complaints.

5          THE COURT:  Okay.

6          MR. MORRO:  So I think that might be around the time

7     that Ricky Jones realized that Shawna had taped him and was

8     using the tapes as evidence.

9          THE COURT:  And I assume that was not the tapes that

10    were taken by her sister's husband, the officer, because he did

11    that on his own.

12         MR. MORRO:  Right.  That was on his own.  Shawna --

13         THE COURT:  So these are separate ones?

14         MR. MORRO:  Yes, sir.  They're separate.

15         THE COURT:  Okay.

16         MR. MORRO:  And it's Shawna's voice and Mr. Jones's

17    voice.

18         THE COURT:  So, then, the hostile work environment

19    lasted the entire period until she was terminated in November

20    of 2016; correct?  You're saying it was a continuous hostile

21    work environment?

22         MR. MORRO:  Yes.  And part of that from that time was

23    Keith Day as well incorporated into that hostile environment.

24         THE COURT:  All right.  I'm not sure that I

25    understand from the face of your complaint how this hostile

1    work environment is related to her disability.  If I understand

2    correctly, you're saying that she's disabled in that she has

3    fibromyalgia and PTSD and perhaps other sort of emotional

4    disabilities.  How is -- are you alleging that they treated her

5    in a way -- that they treated her hostilely because of her

6    disability?  Like, how do you connect her disability with the

7    treatment that came post-EEOC?

8              MR. MORRO:  The father knows of fibromyalgia through

9    his new wife, Pat, and knows that a hostile environment and his

10   demeanor could trigger the sickness.

11         And as we've asserted in a case -- the initial case we

12   filed with Judge Putnam for the sister Mandy, that the father

13   purposefully made the situation harsh and hard on the girls in

14   an effort to run them off.  So the answer to your question is

15   he knew they had this sickness, that any kind of nervous

16   problem or his demeanor would exacerbate it.  And thus, that's

17   why she asked to work those different hours and work outside of

18   the time that her father and Pat were there, to, you know,

19   lessen his demeanor, because he did some terrible things at

20   work.  They all work in a common area.  And so I hope I've

21   answered your question.

22             THE COURT:  You did.  I actually understand that.

23   And, for the record, that's Count 2.  The disability is

24   Count 2.  Count 1 is Title VII, and that's the sex or gender

25   discrimination.  And that's the one I think is a little harder

1    for you.  I don't understand how the hostile work environment,

2    after finding out that Ms. Stewart had been taping her father,

3    that his reaction had anything to do with her sex or gender.

4    It seems like it had to do with a family squabble, whereas if a

5    son had done the same thing, he would have treated the son the

6    same way.  It didn't have anything to do with her being female.

7    It had to do with the fact he was mad that he found out his

8    daughter was taping him on behalf of the sister.  So how do you

9    tie this into sex discrimination?

10           MR. MORRO:  I'm looking at Count 1, Judge, on

11   page 15.  And --

12           THE COURT:  See, I don't find it there.  I don't find

13   any tie in the face of the complaint between his actions and

14   her gender or her sex.  I don't understand -- not only do I not

15   understand it, I don't see it in the complaint, which is what

16   we're doing here.

17           MR. MORRO:  Yes, sir.  In looking at the count, I

18   know in paragraph 82, we have asserted that on June 1st, she

19   filed her first EEOC charge.  She was then badgered and

20   harassed, threatened with termination.  And I think that the

21   sex harassment and gender would come in from Keith Day at that

22   point, that he was -- that as a manager of the company --

23           THE COURT:  But, again, the complaint is not that the

24   hostile work environment was Keith Day and the things that he

25   was doing to her.  The complaint is that the father made this a

1    very hostile work environment because he was mad that she was

2    helping her sister.  And, you know, for that count to work, it

3    would need to be that Stewart was continually harassed and

4    badgered based on her gender or based on her sex.  What you're

5    saying is that she was harassed and badgered because she was

6    helping her sister.  That doesn't have anything to do with sex

7    or gender.

8            MR. MORRO:  Well, I think that if it's not clear

9    here, that it is an assertion that it was the sexual harassment

10   that adds to the hostile work environment.  I think I -- I know

11   you've addressed that to a certain extent, and I don't want to

12   just limit anything to just Mr. Jones's demeanor because the

13   sexual harassment has to do with gender.  And if I'm not clear

14   in the complaint, I just don't want to be limited to just the

15   father and whether or not he did anything to his daughter

16   because she was female.  I agree with Your Honor that male or

17   female, he might have reacted negatively to her filing a charge

18   and assisting Mandy.

19       But if it's not clear, certainly we would argue that the

20   gender factor is because of the sexual harassment that was

21   occurring.

22           THE COURT:  Okay.

23           MR. MORRO:  And the father not doing anything about

24   it and believing -- you know, believing Keith Day and siding

25   with him and not helping his daughter.

1          THE COURT:  All right.  Let's turn to Counts 3 and 4.

2   Those are retaliation claims.  Count 3 is a Title VII claim

3   based on sex or gender.  And Count 4 is retaliation based on

4   ADA, and that is with respect to her disability.

5          First of all, talking about the triggering date, I think

6   we've agreed at this point that she was terminated effectively

7   on November the 10th of 2016; correct?  When she got that

8   letter, she never went back to work.  She knew that they were

9   essentially firing her at that point.

10          MR. MORRO:  I would agree with Your Honor.

11          THE COURT:  So at that point, she certainly -- I

12   think in the way that you plead it -- in fact, that's number

13   one, the retaliatory actions include threatening to terminate

14   Stewart.  That's the first one you list.

15          MR. MORRO:  Right.

16          THE COURT:  And really, again, this is the same

17   question that I had on Count 1.  I'm still struggling to

18   understand how the threat to terminate her has to deal with her

19   sex or gender.  It still seems to me that regardless of whether

20   she was male or female, she would have been treated exactly the

21   same.

22          MR. MORRO:  Well, certainly under one, "Stewart

23   complained of sexual harassment against the company

24   superintendent Day," that certainly speaks to a gender issue.

25   Him being male, protecting the male that was sexually harassing

1  his daughter, is it because of her -- I mean, I don't know if

2  it was a homosexual something or other than that, if it would

3  change things, but --

4          THE COURT:  Well, I think that argument, though, goes

5  better to Counts 1 and 5, sort of the hostile work environment

6  or the interference with her ability to work after hours.  I

7  don't think that she was -- I don't think she was fired or

8  terminated necessarily because of her gender.  I think she was

9  terminated because -- and I think the defense would say she was

10  terminated because she just stopped working.  And they found

11  others who could do the job, and they offered her an

12  accommodation, and she refused to take it.  And you would argue

13  she was terminated because they were mad she was helping her

14  sister.  But under either of those theories, it didn't have

15  anything to do with what gender she was.

16      I just don't -- just tell me where I'm wrong in that

17  process.  Either one of you, whoever is correct, it doesn't

18  have anything to do with what her gender was.

19          MR. MORRO:  I'm not sure I can concede that point at

20  this moment, Judge.  I hear what you're saying.  But I think if

21  she was -- if it was a man, it might be different.  I don't --

22  I can't say.

23          THE COURT:  Okay.  And I'm assuming for Count 4,

24  you're saying it's the same disability, that her fibromyalgia,

25  emotional issues, including PTSD, those are the same

1    disabilities --

2         MR. MORRO:  Yes, sir.

3         THE COURT:  -- that relate to 4?

4         MR. MORRO:  Yes.

5         THE COURT:  And, again, the number one, the first

6    retaliatory action was the termination of Stewart on November

7    10th, 2016, when the letter was sent; correct?

8         MR. MORRO:  Yes.  I think if we're going to use that

9    as a point, yes, sir.

10         THE COURT:  Okay.  And then Count 5, I have done what

11    defense counsel suggested, and I looked, and I'm not sure that

12    there is a stand-alone claim for interference under the ADA.

13    Have you found any cases that treat interference as its own

14    claim, as opposed to any other type of claim?  Because, you

15    know, defense counsel is correct.  This is essentially, if not

16    exactly, cut and pasted from the previous count.  It's just

17    given a different label.

18         What is different about your interference claim than your

19    retaliation claim?

20         MR. MORRO:  Well, I'd first like to say that the

21    Eleventh Circuit has not ruled in this matter, but other

22    circuits have.  And the interference just comes from his

23    threats to file these lawsuits, which he has actually done.

24    He's come through with his threats on filing the lawsuits.

25    He's interfered with her ability to move forward on her EEOC

1    action.  I'm looking in my notes, Your Honor.

2              THE COURT:  Wait.  Could you repeat that last line?

3    He interfered with what with regard to her EEOC action?

4              MR. MORRO:  He interfered with her ability to further

5    her EEOC charge by contacting the EEOC and actually saying he

6    was going to author a letter for her to sign to take to the

7    EEOC.  I mean, all of these things are spelled out, as far as

8    what he did in the fact pattern, he being Ricky and Pat, in an

9    effort to try to get her to not follow through with her EEOC.

10   It's clear on the body camera with talking to Mr. Powrzanas,

11   Mandy's husband, that he was threatening all of this -- he

12   wanted her to make it go away or he was going to F them up.

13     So the interference has do with his actions after she

14   filed her first EEOC charge and then continued to go against

15   his wishes and drop everything.

16             THE COURT:  You were not counsel for Ms. Stewart at

17   the time; correct?  It was Adam Porter.

18             MR. MORRO:  Right.  It was another -- right.

19             THE COURT:  What actions was Stewart or Mr. Porter,

20   on her behalf, taking with regard to that pending EEOC charge

21   at the time?  You're saying that Ricky Jones interfered with

22   Stewart's ability to prosecute her EEOC charge.

23             MR. MORRO:  Yes.

24             THE COURT:  What was Mr. Porter doing on her behalf

25   during that time?

1        MR. MORRO:  Well, I would almost have to say probably

2   nothing because it was being investigated, I suppose, by the

3   EEOC investigators once the charge is made.

4        THE COURT:  So if that's the case and Mr. Porter

5   couldn't do anything at the time period, then how did Mr. Jones

6   prevent Mr. Porter or Stewart from prosecuting the claim?  At

7   the point that the EEOC claim is given to the EEOC and Stewart

8   and her attorney can no longer control the EEOC's decision,

9   then how can anything Jones does interfere with her ability to

10  get a favorable outcome?  She doesn't have the ability at all

11  to influence the outcome.  So I don't understand the

12  interference.  Once the charge has been filed with the EEOC,

13  then how is he interfering with the outcome?

14       MR. MORRO:  Well, I think he's interfering with the

15  process.  He's interfering with her ability to at least follow

16  through with the investigation, if any kind of rebuttal.  I

17  think it's outlined, Judge, starting with paragraph 42 in the

18  first amended complaint, where we talk about the canceling of

19  the health insurance.

20       Paragraph 47, "Jones inquired about Stewart's pending

21  complaint lawsuit with the EEOC.  He incessantly badgered her

22  and actually got a letter from Trip, that Trip was going to do

23  something to interfere with her ability to follow through with

24  her claim."

25       49, "Jones stated once this letter was received, either

1   Jones Utility or his attorney, Trip Umbach, would provide the

2   necessary information for Shawna Stewart's employer to obtain

3   health and dental insurance."

4        So she was being threatened at that time by her father and

5   at least inferring that Mr. Umbach would do certain things if

6   she recanted.

7             THE COURT:  Yes.  I'm looking at Exhibit 20-2, and

8   it's an e-mail exchange between Adam Porter and Mr. Umbach.

9   And it says, "For Settlement Purposes Only," which, again,

10  makes me question why I'm reading it, but here it is.

11            MR. UMBACH:  We had the same question, Your Honor.

12            THE COURT:  And I'll let you address that when you

13  get up.  But it was attached, and I have questions about it for

14  timing purposes.  It appears to me that at least as early as

15  November of 2016, the attorneys were discussing a possible

16  settlement that would make the EEOC complaint go away.  I've

17  got an e-mail on November 1st from Stewart's lawyer to Jones's

18  lawyer saying that here is our demand that would make it go

19  away.  On November 18th, which again, is shortly after the

20  effective termination, Mr. Jones's response through his lawyer

21  is:  "We don't agree with those demands.  We've been authorized

22  to file a lawsuit unless this goes away."

23        So you would say that the interference was certainly

24  occurring in November of 2016, when the lawyers are talking

25  back and forth about trying to settle this case; and if not,

1   there would be a lawsuit?

2        MR. MORRO:  Right.  And he hasn't stopped

3   interfering.  It's still going on.

4        THE COURT:  Okay.

5        MR. MORRO:  It's a continuing allegation.

6        THE COURT:  And I know you're going to object,

7   obviously, that that's not true.

8        MR. UMBACH:  Oh, I just wanted to understand if he

9   was talking about me.

10        THE COURT:  I'm assuming you're talking about Ricky

11   Jones, not Mr. Umbach?

12        MR. MORRO:  No, I'm talking about Mr. Jones and

13   his -- any team of lawyers that he has --

14        THE COURT:  Okay.

15        MR. MORRO:  -- are perpetuating falsehoods in all of

16   these cases and know the truth but refuse to acknowledge it,

17   and are using the court system and these different rules and

18   briefs and assertions to try and hide the fact that they're all

19   aware of the pay-to-play scheme at the Water Works.

20        And it's just a pattern and practice that Mr. Jones has,

21   and Ms. Jones has, and Mr. Umbach has, and any team of lawyers

22   that's associated with our adversaries.

23        THE COURT:  And I just want to make it clear for the

24   record that nothing in the five federal counts that I have

25   before me has anything to do with the Water Works.  You're just

1    saying that's part of an overarching story of this case?

2         MR. MORRO:  Yes, sir.

3         THE COURT:  Okay.  Let's see.  So one of the

4    arguments that the defense has levied against you is that you

5    did not seek to file or did not file an EEOC complaint within

6    180 days of the triggering events.  And I think that your two

7    arguments have been this was a continuing violation and/or that

8    I should apply equitable estoppel, that there was some reason

9    that, for equity purposes, I should not apply 180 days, or I

10   should run it from a different date.

11        Let's start with the estoppel.  What is your best argument

12   as to why the 180 days should not start to run from the

13   triggering events?

14        MR. MORRO:  Well, because of just the fact pattern of

15   what occurred, Mr. Jones, Ms. Jones, and Keith Day, and what

16   they all did in efforts to chill her seeking the EEOC's

17   assistance in rectifying the problems that she was having at

18   work.

19        THE COURT:  But you would agree with me, though, that

20   she had an attorney during this time period.  On the day that

21   she was terminated, November 10th of 2016, she was represented

22   by counsel, Adam Porter; correct?

23        MR. MORRO:  I don't know for sure.

24        THE COURT:  Well, you put e-mails in the record from

25   Adam Porter to Mr. Umbach during that entire month, and he is

1    purporting to represent her on all legal matters.  So I think

2    you'd have to agree that he was her lawyer at the time.

3              MR. MORRO:  I will agree.

4              THE COURT:  So what prevented Adam Porter from filing

5    an EEOC complaint on her behalf once she had been fired?  Why

6    could he not do it within those 180 days?  What stopped him

7    from doing it?  He's a lawyer.  He knows the law.  He knows

8    that a complaint has to be filed.  In fact, she had filed one

9    regarding Keith Day.  So what prevented him from doing so with

10   regard to the hostile work environment and the retaliatory

11   firing?  Why couldn't he do it then too?

12             MR. MORRO:  The lies and the fraud perpetuated by

13   Mr. Jones and his attorney.

14             THE COURT:  But that would seem to me to make it all

15   the more important that he file it.  If you believe that the

16   other side is lying and hurting your client, then that would

17   not be reason not to file charges.  That would be extra reason

18   to file charges; correct?

19             MR. MORRO:  No.

20             THE COURT:  Let me change it this way.  If she had

21   been your client at the time, and you believed that Ricky Jones

22   and Pat Jones and Jones Utility had created a hostile work

23   environment, had fired her for retaliatory reasons, were lying

24   about her in public, would you not have immediately filed a

25   claim on her behalf within the time period to ensure that she

1  didn't waive it later?  If it were you.  I know you're not Adam

2  Porter, but if you had been her attorney at the time, would it

3  not have been better practice to file the complaint within 180

4  days to make sure this argument didn't happen?

5          MR. MORRO:  Judge, as you well know, you can't make a

6  client do anything.

7          THE COURT:  Yes.  But you're the attorney.  What

8  would you have recommended to her?  Within those 180 days,

9  would you have said, "You know, Ms. Stewart, I recommend you

10  file a complaint to the EEOC against your parents, or your

11  father and your stepmother and the company, for firing you, for

12  taking away your accommodations of working after hours, for

13  creating a terrible, horrible work environment, and lying about

14  you?"  Would you personally, Mr. Morro, have advised her to

15  file an EEOC complaint, to put that flag down so you could

16  later file a federal lawsuit?

17          MR. MORRO:  Knowing Shawna now and knowing how sick

18  she is and continues to be, I mean, I would certainly have

19  advised her to do certain things.  But I'm not in a position

20  right now, and I wasn't there at the time.  You know, hindsight

21  is 20/20.  But there must have been something so egregious and

22  something so terrible in the conduct of Mr. Jones to stop her

23  from furthering this case.

24          THE COURT:  But what stopped Adam Porter, the lawyer?

25  Regardless of what Ms. Jones's ability was, she had a lawyer

1    who was actively negotiating settlement terms during this

2    180-day period.  He knew what was going on.  He knew all of the

3    allegations.  He knew she had been terminated.  He had the

4    letter.  What stopped him?  I don't see anything in the

5    complaint and anything in your briefs that explains why he

6    personally didn't help her file an EEOC complaint during the

7    relevant time period.

8              MR. MORRO:  The answer is fear and extraordinary

9    circumstance that caused him to fear Ricky Jones.

10             THE COURT:  So the lawyer's fear of Ricky Jones

11   prevented him from filing a complaint?

12             MR. MORRO:  It would be pure speculation for me to --

13   I haven't talked to Mr. Porter, so -- but I know the

14   circumstances, Judge.

15             THE COURT:  But the problem is you have the burden of

16   proof when it comes to coming up with equitable tolling or

17   estoppel.

18             MR. MORRO:  Right.

19             THE COURT:  You can't just say that I'd have to

20   speculate or I'm not sure.  You have to tell me why I, as a

21   court, should excuse a competent lawyer who represents a

22   client, who you have told me had every bit of knowledge of the

23   terrible things that her parents and the company were doing to

24   her, why he didn't file a timely EEOC charge.  I've heard

25   nothing about his ability, or his ability to talk to her.  I

1  mean, he wasn't blocked from talking to her.  Clearly, from the

2  e-mails you have given me, they were communicating back and

3  forth.  Clearly, he was talking to both sisters and had demands

4  from both of them.  Clearly, they knew they were going to be

5  sued, based on the e-mails that I've read.  Everybody knew what

6  was going on.

7        I have not heard from you, either in briefs or today, a

8  reason that I should equitably toll that 180-day period, when

9  everybody knew what was happening, they had a competent lawyer

10  who had already been helping them with one EEOC charge and was

11  actively negotiating settlements, why he couldn't file an EEOC

12  complaint.  That's the question.  What is your --

13            MR. MORRO:  Yes, sir.

14            THE COURT:  -- best argument as to why I should

15  excuse his failure?

16            MR. MORRO:  My best argument would be under *Hipp v.*

17  *Liberty National Life Insurance Company*, H-I-P-P *v. Liberty*

18  *National Life Insurance Company*.  That's a 2001 Eleventh

19  Circuit case.

20            THE COURT:  Do you have the citation?

21            MR. MORRO:  It's going to be 252 F.3d 1208.

22            THE COURT:  Okay.

23            MR. MORRO:  "Equitable estoppel is invoked in cases

24  where the plaintiff knew of the existence of his action, cause

25  of action, but the defendant's conduct caused him to delay

1    bringing his lawsuit.  The continuing violation doctrine

2    permits a plaintiff to sue on an otherwise time-barred claim

3    when additional violations of the law occur within the

4    statutory period."  And that's *Hipp*.  "The purpose" --

5         THE COURT:  And that's 252 F.3d 1208.

6         MR. MORRO:  And then it's 1221 to 22.

7         THE COURT:  Okay.

8         MR. MORRO:  "The purpose of permitting a plaintiff to

9    maintain a cause of action on the continuing violation theory

10   is to permit the inclusion of acts whose character as

11   discriminatory acts was not apparent at the time they

12   occurred."  And that's *Rager v. Augustine*.  And it

13   attributes -- "equitable estoppel presupposes a legal

14   shortcoming in a party's case that is directly attributable to

15   the opposing party's misconduct."  And that's *Zainulabeddin v.*

16   *University of South Florida Board of Trustees*.

17        THE COURT:  Right.  But I've looked at that because

18   the defense addressed that in the reply brief.  And that

19   misconduct is typically withholding information or lying about

20   court proceedings, something that prevented you from

21   understanding what you needed to do.  And where I find that

22   this is different is, I've still heard nothing that prevented

23   the lawyer, Adam Porter, or the client, Shawna Stewart, from

24   understanding how the EEOC process worked, particularly when

25   they had a pending EEOC complaint on other matters.

1    They knew how the process worked.  They knew how the

2    parents had been treating them and the company had been

3    treating them.  I don't know what lies you're referring to that

4    would prevent them from not having -- or would prevent them

5    from having the knowledge that a complaint or a charge was

6    necessary to move forward.

7    So you're going to have to tell me what lies were they

8    told by Ricky Jones that prevented them from understanding the

9    EEOC process, when they clearly had exercised it once and would

10   go ahead and exercise it again the very next year.  Clearly,

11   she knew before and after how the process worked.  What about

12   this one specific window in time happened?  What did her father

13   do or say to her that prevented her from understanding?

14            MR. MORRO:  Yeah.  And, Judge, I hear you, and I hear

15   you using the term "prevented her from understanding the

16   process," and I go back to the fear.  I don't think fear

17   prevented her from understanding the process, or Mr. Porter

18   from understanding the process.  But all I could say is that

19   fear and the promises of -- and the threats against her at the

20   time played a part in her not moving forward with the EEOC

21   process.  I don't think -- I don't think we're trying to say

22   that it jumbled her mind so much that she couldn't understand

23   what the next step was.

24            THE COURT:  You're saying she was intimidated, that

25   she was so intimidated by her parents and the company as to

1    what they might do to her that she was afraid to file something

2    because they might do something like take her insurance away or

3    take away her inheritance or --

4            MR. MORRO:  Which they did.

5            THE COURT:  I understand.  I've read the complaint.

6            MR. MORRO:  Yes, sir.

7            THE COURT:  The problem with that sort of

8    intimidation and fear is, I mean, the defense has pointed out

9    cases that say intimidation and threats, you know, sort of

10   fear, is not enough in this.  That's why I keep pressing you on

11   it.  I'm trying to find something that you can give me that is

12   outside the cases, and I just haven't heard anything.  I mean,

13   everything -- just fear alone is not enough.  She understood

14   the process.  Her attorney understood the process.  They

15   exercised it twice.  And I don't know what changed in this

16   period of time that would prevent her from filing a timely

17   complaint.

18           MR. MORRO:  And one of the points I'd like to make,

19   Judge, is that in this point in the proceeding, that discovery

20   unlocks those questions -- unlocks those answers.  So at the

21   motion to dismiss phase, it's too early to, you know, dismiss

22   it just based on I believe the questions of the court and, you

23   know, questions about what caused it, because that could be

24   found out in discovery.

25           THE COURT:  But that's not true if you don't plead in

1   the complaint what it is you need discovery on.  I don't see

2   anything on the face of the complaint that explains the failure

3   to file a timely EEOC charge.

4           MR. MORRO:  Well, certainly, Judge, you could infer

5   fear from the different facts that we've listed in the

6   complaint.

7           THE COURT:  But, again, if I read the cases to say

8   that fear of reprisal is not enough to excuse the failure to

9   file a complaint, then you have -- you have nothing to fall

10  back on.

11          MR. MORRO:  I'll have to look at the other circuits,

12  Judge, because they have ruled on that, and I'll have to

13  concede that I'm not prepared today to argue it intelligently

14  enough to convince Your Honor.

15          THE COURT:  Okay.  All right.  That's all the

16  questions I've got for you.  You can take a seat, and you can

17  come back up after I talk to defense counsel.

18          MR. MORRO:  Yes, sir.

19          THE COURT:  The first thing I want to do is similar

20  to what I was doing with Mr. Morro.  I am trying to get on the

21  record the appropriate dates.  And it seems that the triggering

22  event was the termination on November 10th of 2016.  The

23  corresponding complaint is February 15 of 2018, which is more

24  than 180 days; correct?

25          MR. UMBACH:  Correct.  That would be --

1          THE COURT:  So one of your arguments is that they

2    failed to file the complaint within 180 days, and there's no

3    equitable estoppel or continuing violation to excuse it;

4    correct?

5          MR. UMBACH:  Correct.  You said complaint.

6          THE COURT:  EEOC --

7          MR. UMBACH:  We're talking about charge.

8          THE COURT:  -- charge, correct.  Yes.  Just for

9    getting my terms correct.

10          MR. UMBACH:  That's right.

11          THE COURT:  Now, they got the right-to-sue letter, or

12    at least it was dated August 8th of -- August 20th of 2018, and

13    the lawsuit was filed November 23rd of 2018.  And the Eleventh

14    Circuit applies a three-day receipt rule.  So would you agree,

15    then, that the back half of that, the lawsuit was filed within

16    the 90-day period?

17          MR. UMBACH:  For purposes of this motion, yes.  If we

18    discovered something later, we could come back and argue it.

19    But, for this motion, we concede that.  We're not here about

20    the 90-day period on the second charge.  We're here about the

21    180.

22          THE COURT:  All right.  So the 180 is -- and I agree

23    with that.  I think the 180 is the only thing that I have the

24    ability to rule on today in your favor.

25          What is your best counter to the argument that fear or

1    intimidation is sufficient to trigger either equitable estoppel

2    or a continuing violation?  Because I understand your argument

3    on the continuing violation to be once she was terminated, that

4    was the last action of the company, because she no longer

5    worked for the company.  So that would be the triggering date,

6    and anything beyond that goes to the parents, and they're no

7    longer defendants.

8         So the bigger question is equitable estoppel.  Why is

9    Mr. Morro not correct that I should equitably estop the 180

10   days based on the threat of lawsuit, threat of insurance, et

11   cetera, by Ricky and Pat Jones?

12             MR. UMBACH:  I think there are two main reasons, Your

13   Honor.  The cases that we've cited, particularly in our reply

14   brief, out of the Eleventh Circuit, both the Eleventh Circuit

15   itself and some district courts within the circuit -- I'll see

16   if I can find it -- set a very high standard to apply equitable

17   estoppel.  The *Manning* case, Eleventh Circuit case, 786 F.2d

18   1108, and then a Middle District case decided by Judge

19   Thompson, *Baker v. Peters*, 145 F. Supp. 2d 1251, are cases out

20   of this jurisdiction.  But across the country, the cases set a

21   very high standard for equitable estoppel, particularly when

22   the claimant is represented by counsel.  And she has been

23   represented throughout this process by one attorney or another.

24        And, Your Honor, we have talked so far in the argument

25   about Mr. Porter.  I can't point Your Honor to anything in the

1    record, as I stand here, regarding when Mr. Morro took over as

2    the attorney.  He may be able to speak to that.  I believe he

3    was involved at the time that Ms. Stewart received her

4    right-to-sue notice on the first charge.

5            THE COURT:  And that, for the record, is the -- is it

6    Mr. Day?  It's the sexual harassment charge, Keith Day had been

7    harassing her at the office, and nothing had been done about

8    it.

9            MR. UMBACH:  That's the allegation.  Yes, Your Honor.

10           THE COURT:  And there was no federal complaint filed

11   within 90 days of that right-to-sue letter; correct?

12           MR. UMBACH:  Exactly.  And that was received -- that

13   right to sue was received March 24th of '17, so that period,

14   the 90-day period ran June 24th of '17.

15       And then the other -- one other point I would make to your

16   question, what is the best argument in terms of not applying

17   equitable estoppel, is Ms. Stewart knew the process.  I mean,

18   she had filed two EEOC charges and was represented by counsel.

19   I mean, this is not a case where we're dealing with an

20   unrepresented person who's, you know, had factual information

21   misrepresented to her, or she filed it in the wrong forum, or

22   all the typical cases or scenarios where equitable estoppel

23   might apply.

24           THE COURT:  Okay.  You have asked me to dismiss all

25   claims, federal and state.  But the Eleventh Circuit -- let's

1    assume that I agree with you that these were untimely filed and

2    thus -- it's not a jurisdictional question, but I would not

3    have the ability to rule on them if they were untimely.  If

4    that's the case and the federal claims go out for untimeliness,

5    the Eleventh Circuit generally says that district courts should

6    not exercise jurisdiction supplementally over state law claims

7    because they're state law claims, and state courts should do it

8    instead.

9        What is your position on the question of if I find that

10   the federal claims are due to be dismissed, whether or not I

11   should exercise supplemental jurisdiction over the state law

12   claims?

13           MR. UMBACH:  Your Honor, my recollection of the law

14   on that point is that the leaning in the cases is that the

15   state law claims would be dismissed.

16           THE COURT:  Right.  Without prejudice.

17           MR. UMBACH:  Without prejudice.

18           THE COURT:  So they could be reraised in state court.

19           MR. UMBACH:  I acknowledge that.  I think my best

20   argument to you is just purely efficiency and not having to

21   continue to perhaps fight the same claims in another forum.

22   That's it.  I'll be candid.

23           THE COURT:  It wasn't that long ago that I was also a

24   litigator, like two months ago, so I understand the efficiency

25   concern.  But on this side of the bench, I have other concerns

1    too.  And what really concerns me the most is, there are six
2    state law counts, and some of them, you said there are serious
3    questions of state law as to whether or not they even exist.
4          There's an abuse of process, malicious prosecution.
5    There's a handful of frauds for Count 8.  Negligent infliction
6    of emotional distress, intentional infliction of emotional
7    distress, and promissory estoppel.  And if I remember your
8    briefing correctly, you say at least some of those are not
9    accepted by Alabama state courts as even viable claims, as a
10   proper claim; correct?
11              MR. UMBACH:  Yes, Your Honor.
12              THE COURT:  And wouldn't that really be better to let
13   the state courts determine whether that's true or not than a
14   federal court telling the state courts what they can do?
15              MR. UMBACH:  I would agree.  And perhaps --
16              THE COURT:  I know that doesn't -- I know that
17   doesn't get your clients out of litigation, but I think that --
18              MR. UMBACH:  It's not what my client wants, but I
19   think I have to acknowledge that, particularly when these
20   claims are based in part on a pending state law case.  One of
21   the complaints or the claims in this case is really a defense
22   to a claim that is pending in a state court now.
23              THE COURT:  Yes.  Which is why I asked everyone at
24   the beginning of the hearing today whether or not there were
25   counterclaims by Ms. Stewart in the case brought by her father

1    and the company, because it sounded to me -- and, frankly,

2    getting you behind the curtain, it has sounded to me very much

3    like this is a state law -- a state court fight, that if this

4    truly isn't a Title VII or an ADA fight, but this is truly

5    family versus family over the sisters' disagreements with their

6    stepmother and father over the company and over the assets of

7    the family and the company, that that doesn't really have

8    anything to do with sex, gender, or disability.  That has to do

9    with two sisters who don't appreciate stepmother and have

10   gotten into a fight over it, and father has taken one side, and

11   now we've been in court for three years.  Am I reading this

12   incorrectly?

13             MR. UMBACH:  It's not the kind of case Your Honor

14   expected to hear when you were appointed.

15             THE COURT:  Agreed.

16        All right.  Mr. Morro.

17        Thank you, Mr. Umbach.

18             MR. UMBACH:  Yes, Your Honor.

19             THE COURT:  I've got two questions before you can get

20   back into anything you wanted to add.  The first one is:  When

21   did you become an attorney for Ms. Stewart?

22             MR. MORRO:  To be honest with you, I don't know the

23   exact date.

24             THE COURT:  Don't remember?  But you did file the

25   second EEOC charge, or were you with her at that time?

1    MR. MORRO:  I believe so.

2    THE COURT:  The second one is:  What is your position

3    on the supplemental jurisdiction question?  If I agree with the

4    defendants that I cannot proceed on the ADA and Title VII

5    claims for untimeliness reasons, should I go ahead and rule on

6    their motion to dismiss on the state law claims, or should I

7    dismiss them without prejudice and allow you to reraise them in

8    state court?

9    MR. MORRO:  No, I think Your Honor should hang on to

10   the jurisdiction of those cases.

11   THE COURT:  Why should I?  What advantage is there of

12   a federal court dealing with only state law claims when there

13   are questions of state law viability?

14   MR. MORRO:  Because your assertion that it's just a

15   family matter is absolutely 100 percent incorrect.

16   THE COURT:  Well, it is clearly a legal matter.  And

17   to the extent the record makes it seem like I think this is

18   just a family feud, it is not.  But my point in that is, I am

19   struggling, from the face of your complaint and reading the

20   cases, to decide how this is an ADA or Title VII case,

21   particularly when I can't see that a timely EEOC charge was

22   filed.

23       The lawsuits started happening before the operative EEOC

24   charge.  I think we all agree with that.  We've all said in

25   here today that the lawsuits started being filed before

1     Ms. Stewart's second EEOC charge.  So I agree with you that

2     this is not just a family dispute.  It is definitely a legal

3     dispute over many different matters.  That said, my question

4     is:  If there are only state law claims that are left, who is

5     better suited to deal with them?  The state courts or the

6     federal court?

7               MR. MORRO:  Well, I think the federal court.  I'm

8     still not sure why the second charge you're saying is not

9     meeting the requirements of allowing you to have jurisdiction

10    over these cases.

11              THE COURT:  And I think that it's pretty clear from

12    my questioning today that it's the timeliness matter.

13              MR. MORRO:  I thought you said that it was timely on

14    the second charge.  And even if the first one you rule is not

15    equitable estoppel, due to fear and intimidation, certainly

16    it's background information for the second charge, which is

17    going to be utilized by the court.

18              THE COURT:  Well, the problem is, if you're talking

19    about the second charge being the Keith Day charge, that one is

20    clearly out of time with regard to this complaint.  As

21    Mr. Umbach said, you got your right-to-sue notice in March of

22    2017, I believe.  And this lawsuit wasn't filed until November

23    of 2018.  That's more than a year and a half later.  That's

24    clearly not within 90 days.

25              So you can't fall back on the 2016 EEOC complaint.  That's

1    why I asked you at the very beginning of today which one was

2    the operative EEOC charge, because the only one of the two that

3    you filed the lawsuit within 90 days of getting a right-to-sue

4    letter was the 2018 one.

5         So any argument in which you're trying to make me go back

6    to the 2016 charge is very much against your client's

7    interests.

8              MR. MORRO:  Judge, I'm looking at the charge that is

9    on Document 13, page 30.  That's the 2-8-18 charge.

10             THE COURT:  I have it.

11             MR. MORRO:  And you're saying that that --

12             THE COURT:  I'm saying that this one is the operative

13   one.  I'm saying that the allegations that you make in Counts 1

14   through 5 are contained in this charge.  This was the second

15   one.

16             MR. MORRO:  Okay.  Yes, sir.

17             THE COURT:  The problem I'm finding -- and defense

18   counsel has admitted that you filed your lawsuit within the

19   90-day window because of the Eleventh Circuit's three-day rule,

20   that it was filed within 90 days of getting a right-to-sue

21   letter on this charge.

22        The problem is this charge was filed in February of 2018,

23   but the operative actions all occurred in the fall of 2016,

24   which means instead of filing within 180 days, your client

25   waited a year to a year and a half.  And if your client didn't

1  file the EEOC charge within 180 days, then no matter whether I
2  think you have a meritorious claim or not from the face, I
3  can't decide it.  It is a bar to me granting you relief if you
4  didn't get to the EEOC in time.
5          MR. MORRO:  And, Judge, I'm looking at this page 30,
6  the charge, and it says latest, under "Date discrimination took
7  place," 3 of 2017.  And I'm having a hard time seeing that if
8  it's 4-11 of 2018.  So I'm not seeing how we're restricted just
9  to 2016 on the face of this case -- on the face of the actual
10 charge itself.
11         THE COURT:  Well, first of all, it can't be
12 4-11-2018, because this was filed in 2-15 of '18.  So you're
13 saying the discrimination went two months into the future.
14         MR. MORRO:  And I certainly don't want to --
15 obviously, that.  I'm looking at the date.  Perhaps that's a
16 typo and that's '17?  I'm not really sure.
17         THE COURT:  Let's assume for the second that it says
18 January 11th of 2018.  The problem is in your complaint, in
19 your brief, and today, you've never mentioned anything that
20 happened on January 11th of 2018 that would have made that the
21 operative date.  And before you argue on what that is, the
22 Supreme Court has said that I am to look at the actions, not
23 the consequences.
24     If the action that started this was in June,
25 the hostile -- in June of '16, the hostile work environment

1   started, and the retaliation started when she was fired in

2   November of '16, then even if the consequences extended all the

3   way into January of 2018, it's not the date of the consequences

4   that matters.  It's the date of the actions that the company

5   took.

6       And all of the company's actions that started the hostile

7   work environment and that started the retaliation and started

8   the interference all occurred in 2016.  And we've all agreed on

9   that today.  That's when everything happened.

10      So it doesn't matter what you put in the box.  What

11  matters is is when the actions occurred.  And even if you read

12  the inside of this complaint, everything -- this is talking

13  about things that occurred before January of 2018.

14          MR. MORRO:  Well, at least in the second page of the

15  charge, it says, "Mr. Jones filed his lawsuit against myself

16  and Mandy jointly on January 11th, 2018."  So I guess I'm

17  saying that must be, like you say, January 11th of 2018, and it

18  certainly is encompassed in the charge itself on the second

19  page next to -- next to last paragraph.

20          THE COURT:  I see that.  I now agree that whoever

21  wrote this charge for Ms. Stewart is saying that the latest

22  action is January 11, 2018.  Then for me, the legal question

23  is:  Does that matter?  Because is that just a consequence of

24  everything that started in 2016?

25          MR. MORRO:  Well, it's a retaliatory lawsuit filed

1    against her for her participating in the EEOC process and

2    asserting her rights against her employer.

3            THE COURT:  But she -- you're talking about all the

4    way back to the 2016 Keith Day.

5            MR. MORRO:  Sure.  That's all part of it.  And if you

6    don't find that it's -- you have jurisdiction because it's

7    untimely, it certainly, like I say, is background information

8    as a continuing incident that occurred all the way to, and as

9    we've put in this charge, January 11th of 2018.

10            THE COURT:  Okay.

11            MR. MORRO:  I mean, it's just an ongoing saga of

12    abuse by her employer.

13            THE COURT:  Was there anything else that you wanted

14    to add?

15            MR. MORRO:  I think I have -- I just want to

16    reiterate the point that you're being misled by counsel today.

17            THE COURT:  In what way?  Because saying that counsel

18    is lying to a federal judge is a pretty big, if not offensive,

19    remark.  So I'm going to force you to tell me how counsel is

20    lying to me.  I'm not going to let it go.

21            MR. MORRO:  Because counsel knows that all of the

22    assertions in this complaint are true and factual.  He's been

23    representing Ricky Jones for a long period of time and, like a

24    parent who is an enabler, is enabling Ricky Jones to violate

25    the law, not only federal law, in these actions as an employer,

1    but in fraud against the citizens of Jefferson County and the

2    Water Works.

3              THE COURT:  And that may be true.

4              MR. MORRO:  Yes, sir.

5              THE COURT:  And even if it is true that the facts you

6    said are accurate, it is Mr. Umbach's job to represent his

7    client.  And what I take from his brief is he is saying that

8    there is a legal reason that this should not be in federal

9    court.  And I do not take offense from him arguing on behalf of

10   his client any more than I take offense at you arguing very

11   strenuously on your client's behalf, which you have done very

12   well today.

13             MR. MORRO:  Thank you, Your Honor.

14             THE COURT:  But I don't like an insinuation that any

15   lawyer is lying to a judge.  It's just -- I would never have

16   said it when I was a lawyer.  So when I hear it said as a

17   judge, I need to know what I'm being lied to about.

18             MR. MORRO:  Yes, sir.

19             THE COURT:  Because if it's actually happening, I'll

20   deal with it.  But if the lies or the misrepresentations are

21   only that counsel knows that the pleaded facts are true, and

22   yet he is still trying to represent his client to ensure that

23   they are victorious, that's his job.  I don't know that I can

24   take offense at that.

25        If there's something else he's lying to me about, if

1   there's something he's misrepresented that he says happened and

2   didn't, in other words, if he's lying to me factually, then let

3   me know that, because then I'll deal with it.  But if it's just

4   that he says "denied" in his answer and is trying to win based

5   on a legal argument, then I don't know that's sufficient to

6   really mention.

7          MR. MORRO:  And here's what I can pinpoint, Judge.

8   He agreed with your assessment that this was just a family

9   matter, and it really has nothing to do with the employment and

10  the fraud and the illegal activity of Mr. Jones.  He simply

11  agreed.  And in that agreement, he knows that that's not true.

12         THE COURT:  Okay.

13         MR. MORRO:  That is a -- that is just false, and it's

14  misleading you as a tribunal.

15         THE COURT:  All right.  Mr. Umbach, while you're

16  sitting there, I'm going to assume that what you were doing was

17  just agreeing with a judge's assessment, because attorneys

18  typically agree with judges when they're making a point on

19  their side.  You do not agree that this is just a family

20  squabble, that this truly is a viable legal matter on both

21  sides, that both sides have arguments against each other, and

22  that it is at least properly in court, that there's no bad

23  intentions in both sides suing each other?  Or if you don't,

24  let me know.  I want to give you a chance.  You've been said

25  that you misrepresented something to me, so I want you to

1    defend yourself.

2         MR. UMBACH:  Your Honor, this is a legal dispute that

3    needs to be dealt with like all legal disputes, within the

4    rules of procedure and under the law.

5        I have said before in other proceedings that this is a

6    family -- there is a family dispute here, and there is.  Now,

7    counsel and I disagree on whether there is also an employment

8    dispute.  But I don't think anyone can disagree that there is a

9    family dispute here that is very tragic and unfortunate, in my

10    opinion.  And it's going to have to be dealt with.  I regret

11    that it's in the court system, but it is.  And it has to be

12    dealt with, and it's going to take the time and resources of a

13    lot of people to do it.  But when I have said it's a family

14    dispute, that's what I mean.  It is a dispute among family

15    members, a very unfortunate one.

16        And that's it.

17         THE COURT:  Okay.  What I would like to do, I have

18    read all of the cases that defense counsel has cited to me

19    today.  I don't remember if I've read *Hipp v. Liberty National*.

20    If you-all will give me 15 minutes, I'm going to go read that

21    real quick and confer with my staff, who has been in here

22    listening with me.  And before I let you go, I want to come

23    back just real quick.  Okay?

24         MR. MORRO:  Judge, may I assert one more case --

25         THE COURT:  Sure.

1          MR. MORRO:  -- perhaps to read?

2          THE COURT:  Absolutely.  We'll look up whatever you

3    give me.

4          MR. MORRO:  Thank you, Judge.  It's *Swierkiewicz v.*

5    *Sorema.*

6          THE COURT:  Okay.  I'm not going to ask you to spell

7    it.  Let's just get the numbers.

8          MR. MORRO:  I'm looking, but I don't see -- oh, it's

9    534, 514 U.S. 506 (2002).

10         THE COURT:  Okay.  Do that one more time.  534.

11         MR. MORRO:  534, 514 U.S. 506 (2002), and that rose

12   out of *McDonnell Douglas.*

13         THE COURT:  That is Supreme Court law, which means it

14   is supremely binding on me, so I will definitely look at that

15   one.

16         MR. MORRO:  Thank you, Judge.

17         THE COURT:  All right.  I'll be back in about 15

18   minutes.

19       (Recess from 4:15 p.m. to 4:28 p.m.)

20         THE COURT:  For the record, we are back from break.

21   My staff and I have gone back, and we have reviewed the cases

22   that were cited to us, particularly the *Hipp* case cited to us

23   by the plaintiff.  And I have decided that I'm going to issue a

24   ruling on these motions today.  And I will give that ruling to

25   the parties now.

1        Pending before the court is Jones Utility and Richard

2    Jones's motion to dismiss the first amended complaint.  That's

3    Document 17 in the record.  And a similar motion to dismiss

4    filed by Patricia Jones, which is Document 26.  The motions

5    will be granted as to Counts 1 through 5.  Those are the

6    federal law claims.  And they will be rendered moot as to

7    Counts 6 through 11, because I'm going to decline to exercise

8    supplemental jurisdiction.

9        The reasons for the ruling are this:  First of all, I am

10   going to dismiss the claims against the individuals, Patricia

11   Jones and Richard "Ricky" Jones.  As the parties have both

12   conceded in briefing and here in argument today, the individual

13   parents are not proper defendants for the Title VII and ADA

14   claims.  Therefore, based on the parties' agreement that the

15   parents' individuals claims should be dismissed, I do dismiss

16   them as agreed upon.

17       That leaves the counts against defendant, Jones Utility,

18   the company.  As to Count 1, which is a Title VII claim,

19   hostile work environment, I find that the court cannot rule on

20   this claim because the EEOC charge was untimely filed.  As

21   counsel for the plaintiff conceded in brief and today at the

22   hearing, the hostile work environment started on June 3rd,

23   2016, when Ricky Jones discovered that his daughter had been

24   secretly taping him and was using this as part of her sister's

25   lawsuit.  That hostile work environment continued through

1  November 10th, 2016, when both parties agree that Ms. Stewart

2  was effectively terminated.

3       I find that the appropriate date -- the appropriate

4  trigger date is June 3rd of 2016, because that is when the

5  hostile work environment started.  And using that date, the

6  complaint -- the EEOC charge was not filed in time, not within

7  180 days.  Even if I give Ms. Stewart the benefit of the doubt

8  and run the date from November 10, 2016, the date she was

9  fired, her EEOC charge on hostile work environment was still

10  clearly filed well outside of 180 days.

11       As to Count 2, I make the same finding.  There was no

12  timely EEOC charge.  Again, for the reasons I just stated, I

13  find that the triggering date of action was June 3rd, 2016,

14  when the plaintiff has agreed that the hostile work environment

15  started.  The EEOC charge which was filed in February of 2018

16  is not within 180 days.  And, again, even if I run the date

17  from November 10, 2016, when Ms. Stewart was fired or

18  terminated from her employment, it is not within 180 days.

19       As to Count 3, which is a Title VII claim for retaliation,

20  I find that I cannot rule on this claim because there was no

21  timely EEOC charge.  The retaliation, as counsel acknowledged

22  today, occurred or at least began on November 10th of 2016,

23  when Jones Utility effectively terminated Ms. Stewart.  Because

24  Ms. Stewart did not file an EEOC charge regarding retaliation

25  until February of 2018, she did not file it within 180 days.

1      As to Count 4, I make the same finding, ADA retaliation.

2   The retaliation occurred on November 10, 2016, when Ms. Stewart

3   was effectively terminated by Jones Utility.  At that point,

4   she had 180 days to file an EEOC charge.  She failed to do so

5   until February of 2018, which is outside of the appropriate

6   date.

7      As to Count 5, ADA interference, I also question whether

8   or not this is a distinct claim, as argued by defense counsel.

9   That said, I will give the benefit of the doubt to the

10  plaintiff that this is its own distinct claim, and using the

11  wording in the complaint, I will say that the claim is for the

12  removal of an accommodation.

13     As counsel has acknowledged in brief and today, the

14  accommodation, which was working after hours, was removed from

15  Ms. Stewart on November 10th, 2016, in the letter from Jones

16  Utility.  Thus, on November 10th, 2016, she had 180 days to

17  file an EEOC charge for the removal of her accommodation, and

18  she did not do so.

19     For those reasons, all five counts cannot proceed in this

20  federal district court for failure to file a timely EEOC charge

21  within 180 days.

22     There has been an argument that this ruling would not be

23  proper because there was a continuing violation.  I do not

24  agree that the continuing violation doctrine applies here.  As

25  everyone agrees, Jones Utility terminated Ms. Stewart on

1    November 10th, 2016.  From that date forward, she did not work

2    for Jones Utility.  Her employment was no longer with Jones

3    Utility.

4         The issues concerning Ms. Stewart after that were

5    colloquially with her parents, not her employer.  Jones Utility

6    was not her employer at that point.  So even if a hostile

7    environment continued beyond November 10th, the hostile

8    environment was among the family, not the workplace.

9         As far as retaliation goes, after November 10th, the

10   retaliation is more effectively put on the parents, not the

11   employer, because, again, Jones Utility was no longer the

12   employer of Ms. Stewart.

13        And, again, as to Count 5 interference, the removal of

14   accommodations, the accommodation was removed on November 10th.

15   That is not subject to a continuing violation.  The removal

16   occurs that one time on that date.  So for those reasons, I do

17   not find a continuing violation.

18        As to equitable tolling, I do not apply equitable tolling

19   in this case because I find that the ability to file an EEOC

20   charge within 180 days was not outside of the plaintiff's

21   control.  As noted throughout the hearing today, Ms. Stewart

22   was represented by counsel on November 10th, 2016, and

23   throughout the period after that.

24        So within the 180-day period in which Ms. Stewart could

25   have filed and must have filed her complaint or her charge with

1    the EEOC, she was represented by counsel.  We know that counsel

2    was competent and acting on her behalf, based on documents

3    supplied to me by plaintiff's counsel in his brief.  Document

4    20-2 is an e-mail exchange between plaintiff's counsel -- or

5    former plaintiff's counsel and current defense counsel in which

6    the two sides are discussing settlement negotiations.

7         Document 20-5 was the proposed lawsuit by the father Ricky

8    Jones, which was ultimately filed.  That was on November 18th

9    of 2016.  Document 20-3 was a settlement offer in January of

10   2017, from the father Ricky Jones, that he would drop any

11   charges against his daughters, including the plaintiff Stewart,

12   if the daughters would agree to go to counseling.  This, again,

13   caused a back and forth between counsel for the defendant and

14   the plaintiff.

15        All of these communications back and forth during the

16   180-day period shows the court that Ms. Stewart had the ability

17   to file an EEOC charge within 180 days.  The fact that she

18   filed one later, in February of 2018, shows that she knew that

19   she needed to do so and that she knew that it was a

20   requirement.

21        I have reviewed the *Hipp* case cited to me by plaintiff's

22   counsel.  That case involved a collective action, not an

23   individual action under the ADA and Title VII, and thus is not

24   applicable to the facts in front of me here.  Thus, it does not

25   change my opinion that there is no continuing violation or

1    equitable tolling that would excuse the failure to file an EEOC
2    charge within 180 days.
3         So for all of the reasons I just stated, the court finds
4    that Counts 1, 2, 3, 4, and 5 are due to be dismissed with
5    prejudice against all parties, Jones Utility, Ricky Jones, and
6    Patricia Jones.
7         That leaves me with the state law claims, Counts 6 through
8    11.  I find that the motion to dismiss those claims are moot.
9    As we discussed during the hearing, Section 1367(c) gives me
10   the discretion to decline jurisdiction over state law claims if
11   I dismiss all federal claims that give me original
12   jurisdiction.  For the reasons I just said, I do not have or I
13   have dismissed all claims that gave me original jurisdiction.
14   Thus, it is up to the court whether or not to keep the state
15   law claims.
16        I have decided not to keep them for two primary reasons.
17   The first one is, as I discussed with defense counsel and
18   defense counsel acknowledged, there are questions of state law
19   viability.  When there are questions of state law and I can
20   choose whether or not a federal court or a state court will
21   decide them, I side on the side of the state court.  It is
22   their law.  And in an instance where they have the equal
23   ability to decide what their law says, it should be given to
24   them.
25        The second is that the Eleventh Circuit has told we

1  district judges that when a case is in the early stages, that
2  we should typically give it back to the state court.  This case
3  has not had an answer filed by the defendant.  There has been
4  no discovery, to my knowledge.  We are in the very earliest
5  stages of the case.

6  So, for those reasons, I find that the state law claims
7  are more appropriately determined by the state court.  I know
8  that that will continue this case going forward, and that may
9  not be preferable or wanted by one side or the other, but that
10  is the best thing to do in this case.  And most importantly, it
11  is the appropriate thing to do under the law that governs this
12  court.

13  So -- actually, I'm going to add a third thing.  There is
14  a state law case pending in Jefferson County Circuit Court.
15  Counsel has told me that similar, if not the same, factual
16  issues are pending in that case.  If there is a state court
17  that is already dealing with these or similar issues and is
18  much farther down the road than this federal court, that is an
19  extra reason why the state court is the better place for this
20  case.

21  So, in summary, the court dismisses Counts 1, 2, 3, 4, and
22  5 with prejudice.  That means there are no federal law claims
23  pending before this court.  The court thus declines to exercise
24  supplemental jurisdiction over Counts 6, 7, 8, 9, 10, and 11,
25  so the motions are moot with regard to those counts.

1          This is the ruling of the court.  Thus, any motions or

2     appeals should be considered to run today.  I will enter an

3     order consistent with the court's ruling shortly.  Thank

4     you-all for coming.

5               MR. UMBACH:  Thank you.

6               MR. MORRO:  Thank you, Your Honor.

7          (Proceedings concluded at 4:41 p.m.)

CERTIFICATE OF REPORTER


I, Margaret Wasmund, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the Northern District of Alabama, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the court and the Judicial Conference of the United States.

Dated this 23rd day of August 2019.




*Margaret Wasmund*
MARGARET WASMUND, RDR, CRR, CRC
OFFICIAL COURT REPORTER




Proceedings recorded by mechanical stenography; transcript produced by computer.